In the

# United States Court of Appeals

### For the Seventh Circuit

CERTIFIED COPY
A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

No. 10-3747

SURIYA H. SMILEY,

           *Plaintiff-Appellant*,

*v.*

COLUMBIA COLLEGE CHICAGO,

           *Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CV 06183—**Samuel Der-Yeghiayan**, *Judge*.

ARGUED MAY 3, 2011—DECIDED APRIL 30, 2013

Before ROVNER and WILLIAMS, *Circuit Judges,* and YOUNG, *District Judge.*[*]

WILLIAMS, *Circuit Judge*. After receiving a complaint from a student concerning one of its part-time instructors, Columbia College Chicago faculty members and administrators interviewed the student on several oc-

---

[*] Chief Judge of the United States District Court for the Southern District of Indiana, sitting by designation.

casions and also interviewed the faculty member. The school ultimately informed the faculty member, Suriya Smiley, that it would not ask her to teach further classes. Smiley contends the school's decision was based on her race or national origin. Although she maintains that other instructors outside her protected class were treated more favorably, the investigations of other instructors to which she points do not suggest that. The school's procedures did not require the school to contact other witnesses to alleged discriminatory conduct, and the school's investigation of the complaint against her does not indicate that its reason for telling her it would not ask her to teach more classes was pretextual. We affirm the district court's grant of summary judgment in favor of Columbia.

## I. BACKGROUND

Columbia College is a private arts and media college in Chicago. Suriya Smiley was a part-time instructor in Columbia's Radio Department from 1994 through January 2009. She is of Palestinian and Lebanese descent.

Near the end of the fall 2008 semester, one of the nine students in Smiley's Radio Studio Operations class met with two faculty members and said he felt Smiley had singled him out in class because he is Jewish. At one of the faculty members' request, the student outlined his complaint in an email, which he sent on November 18, 2008. The email stated (with punctuation and spelling as it appears in the original):

No. 10-3747 3

I have great concern over some instances in my Radio Studio Operations class with Sue Smiley. They have escalated into being major derogatory, and anti-semetic issues. I would like to recap for you what has happened.

1. On September 8th, In my first class with Sue Smiley, she was doing attendance. She came to my name, and said "you're a JEW" right?" I asked Sue, "why did you ask that?" She said "I could tell by your nose, and last name." Then she said, "I'm an Arab."

2. On October 27th, Sue told me directly she went to Shlotsky's deli with friends over the weekend she said her friends ordered food, and told me, damn those "Jews" know some good food.

3. On November 3rd, Sue asked myself & Joe which I forgot his last name to look at a cd on my computer. The cd happened to contain explicit pictures of her revealing her body.

4. On November 10th, Sue asked me if I knew a recent graduate. I said "no" She said, "I thought all "JEWS" knew everyone." She came to where I was sitting and asked if she could take a picture of me. I said no. She replied with, "are you too religious of a JEW to take a picture?" Then at the end of the class she came very close to my face and smirked and said, "bye sweetie."

Last week when I left the room, I over heard her telling the class that I sucked on the radio. She tells

Case: 1:09-cv-06183 Document #: 67 Filed: 05/22/13 Page 4 of 16 PageID #:972
Case: 10-3747    Document: 00712000012    Filed: 05/22/2013    Pages: 16

4                                              No. 10-3747

> everyone her life story, and laughs at people behind their backs.
>
> These are a few of the instances that I have come up against in her class. I worked for 3 years before coming to college. During that time I encountered many types of people from many backgrounds. Unfortunately there are a lot of misconceptions and generalizations about people in the "real" world. Many times I would come home and repeat in disbelief what someone in the workplace had said to me. But, I chalked it up to them being uneducated and unpolished.
>
> I chose Columbia College not only because of it's reputation as one of the finest schools, but also because of it's diversity. Never did I ever expect to be denigrated and humiliated by a teacher. However, since attending Ms. Smiley's class puts me in a situation of extreme discomfort negatively; I am looking towards your guidance as how to proceed from here.
>
> Please respond as soon as possible so that I can look forward to my future education.

The faculty member set up a meeting with Student A and the Chair of the Radio Department, Barbara Calabrese. At the meeting, Student A repeated what he had stated in his email, said that he was extremely uncomfortable in class and did not want to return, and stated that he felt isolated and singled out in class for being Jewish.

Columbia implemented a revised Anti-Discrimination and Harassment Policy in August 2008. Among other

No. 10-3747                                           5

things, it provides that students will not receive unfavorable treatment based on race or religion. The responsibility for investigating complaints raised by students under the policy rests with the Dean of Students' Office. Stephanie Downs, the Assistant Director for Student Development and one of the persons responsible for investigating complaints by students against faculty, met with Student A and documented the meeting in a memorandum. She stated in it that Student A verified all the information in his email. She also stated in the memorandum that the student feared what Smiley would say to him and about him, that he was unsure whether he wanted to submit a written statement, and that he felt that the issue had been resolved because he was no longer in the class.

Downs telephoned Smiley, and the two met in Downs's office several days later. Downs documented this meeting in a December 9 memorandum. Downs's memorandum recounts that Smiley made statements including that she has a "standard joke" with her class; she "goofs around with them"; "I knew I hurt his feelings. It's not going to hurt a regular student."; "[Student A] misunderstood. I guess he is very concrete."; and "I teased him." Downs testified in her deposition that it had been her practice over seventeen years to place quotation marks around statements that were direct quotations, as she did for these statements in her memorandum. Smiley denies stating that she had a standard joke with the class, that she said her comments would not hurt a regular student, or that she said he is concrete. She also denies making any of the remarks

6                                              No. 10-3747

directed to Student A about his religion that he alleged in his email. Smiley presented along with her summary judgment response affidavits from several students in the class who state that she did not make discriminatory remarks.

As was her practice, Downs prepared a "Summary of Discrimination Complaint" that summarized Student A's complaint and her interviews, and she concluded that Smiley violated the Anti-Discrimination and Harassment Policy. Louise Love, Columbia's Vice-President for Academic Affairs, determined the consequences for faculty members who violated the Policy. After receiving Downs's summary, Love, who had not previously met Smiley, had a meeting with Smiley where a union representative and Calabrese were also present. Love testified that as a result of the meeting, she believed from the way that Smiley spoke about her relationship with her students that Smiley did not observe professional decorum. She also believed Smiley did not understand the boundaries between faculty and student based on Smiley's joking and teasing with her students and disclosure of facts about her own family situation. After the meeting, Love prepared a summary memorandum where she noted, among other things, that Smiley said she told Student A's class she was Arab and that she had eaten her first knish, but that she denied making any other comments about Jews. Love also noted that Smiley was aware she embarrassed Student A by making a joke about the fact he did not know certain musicians. Love sent Smiley a letter on January 17, 2009 advising

No. 10-3747                                                                                          7

her that Columbia found her in violation of the Policy and that she would no longer be asked to teach courses.

Smiley filed this suit alleging that Columbia discriminated against her on the basis of her race and national origin in violation of Title VII, 42 U.S.C. § 2000e. She also brought a claim for race discrimination under 42 U.S.C. § 1981. The district court granted Columbia's motion for summary judgment, and Smiley appeals.

## II. ANALYSIS

We review the district court's grant of summary judgment de novo, construing all facts and reasonable inferences in Smiley's favor. *See Matthews v. City of East St. Louis*, 675 F.3d 703, 706 (7th Cir. 2012). Smiley maintains that Columbia College discriminated against her on the basis of her race and national origin. Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 prohibits race discrimination in the making and forming of contracts. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir 2011). We generally apply the same standards to Title VII and section 1981 race discrimination claims at the summary judgment stage. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007).

No member of Columbia's administration or faculty made explicit comments regarding her race or national

8                No. 10-3747

origin, so Smiley proceeds under the familiar indirect method of proving Title VII and section 1981 claims. *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010). Under the indirect method, to survive summary judgment, Smiley must first establish a prima facie case, which she can do by showing: (1) she is a member of a protected class; (2) she met Columbia's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected classes were treated more favorably. *Arizanovksa v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702 (7th Cir. 2012). If she satisfies the prima facie case, the burden shifts to Columbia to identify a legitimate, nondiscriminatory reason for the termination. *Id.* If Columbia does so, summary judgment would only be improper if Smiley produced sufficient evidence that the proffered reason was pretextual. *Id.*

Columbia maintains that summary judgment was proper on the basis that Smiley was not meeting its legitimate expectations. Although Smiley denies some of Student A's allegations, some things are undisputed. Columbia received a written complaint of some length from a student in Smiley's class. At least four Columbia employees met with or interviewed the student and heard him confirm his allegations. Both Downs and Love met with Smiley on separate occasions. Although Smiley denies making some of the statements Student A alleges, she acknowledged that her teaching style involved goofing around with her students, teasing them, and that Student A was upset after she joked with him.

No. 10-3747                                                        9

It is not unreasonable for Columbia to expect that its instructors will teach classes in a professional manner that does not distress students. *Cf. Vaughn v. Vilsack*, ___ F.3d ___, 2013 WL 856515, at *5 (7th Cir. 2013) (explaining that even if plaintiff's conduct did not rise to the level of actionable harassment, plaintiff did not satisfy legitimate expectations where he was not performing his job in a manner that an employer would find acceptable).

If Smiley failed to establish all elements of her prima facie case under the indirect method, then we would not need to proceed further. *Id.* But as we explained in *Vaughn*, sometimes the analysis of the "legitimate expectations" inquiry merges with the pretext analysis, which is what Smiley asks us to do here in light of her suggestion that she has presented evidence that Columbia treated non-Arab and non-Palestinian instructors accused of violating the Policy in a more favorable manner. *Cf. id.* at *5. The focus of the pretext inquiry is whether the proffered reason is a lie. *Id.* That is, the question "is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006). Columbia's letter to Smiley stated that she had violated the Policy. Columbia also asserts it was justified in not asking her to teach more classes in light of her admission that she goofed around with her students, teased her students, and acknowledged

that Student A was upset by one of her comments and bolted out of class.

Smiley maintains that the school's investigation in her case was deficient and that it evidences pretext. An employer's investigation, or lack thereof, can inform the pretext inquiry. *See Humphries*, 474 F.3d at 407 (finding employer's failure to conduct any investigation, including failure to interview the plaintiff, helped show that employer's reason for discharge was a lie). In *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908 (7th Cir. 2010), for example, one of the cases to which Smiley points, the director of nursing decided to fire the plaintiff within twenty-four hours of receiving a complaint that the plaintiff had used profanity, a decision we said the director "reached in an unusual way." *Id.* at 916. Although normally the unit supervisor would have investigated charges in her unit, the director conducted his own investigation and decided to fire the plaintiff. He made that decision without considering the unit supervisor's conclusion that the complaint was unfounded and also without interviewing the plaintiff. The plaintiff also showed that another employee was not questioned about failing to respond to a bed alarm (which the employer later gave as another reason to fire the plaintiff) until two weeks after the incident, and then was not disciplined. *Id.* Under those circumstances, we concluded that a jury should decide whether the plaintiff's discharge was racially motivated. *Id.*

Here, however, the other investigations of instructors accused of violating the Policy do not suggest that in-

structors outside her protected class received more favorable treatment. Smiley argues in this suit that the school should have interviewed other students in Smiley's class before it decided it would not ask her to teach further classes. The school's Anti-Discrimination and Harassment Policy procedures do not require interviews of other witnesses. The only general requirements for investigations at the time were to contact and interview the student and faculty member, and then to determine if the Policy was violated. As Sharon Wilson-Taylor, the Dean of Students, explained when asked to describe the procedure for investigating a complaint raised by a student against a faculty member: "A complaint is raised; the intake staff will contact the student or the faculty, and an interview is conducted. And then it's determined if the policy was violated or not. That's pretty much the process." So no procedure required an investigator to contact other witnesses, although Wilson-Taylor stated that the practice was that if a student or faculty member stated there were witnesses to an incident, the witnesses would be contacted.

The other investigations to which Smiley points do not suggest that instructors outside her protected class were treated more favorably than her. The investigation of Instructor 1 was nearly identical to hers. There, a student made a written complaint against a teacher alleging discriminatory statements made by the teacher toward the student. Downs interviewed only the student, teacher, and department chair, and Downs concluded the teacher had violated the policy. (The department chair decided not to terminate Instructor 1;

12 No. 10-3747

Love was not the decision-maker in that case.) Instructor 2 was accused of using racial slurs in class. Downs interviewed the faculty member and three students, found the Policy violated, and the instructor was not asked to teach any more classes. In Instructor 3's case, Downs twice interviewed the student who accused a faculty member of sexual harassment, and she interviewed the faculty member once. Although other persons could have corroborated the student's allegations and the instructor denied acting inappropriately in his interview, Downs did not interview anyone else. The instructor was not asked to teach further classes. Instructor 4 was also accused of sexual harassment. Downs interviewed the complaining student and a former student, and she corresponded with another former student via email. She found no violation of the Policy. Regarding Instructor 5, after interviewing the complaining student, Downs and Wilson-Taylor concluded the Policy did not apply because the alleged sexual harassment took place off campus.

These other investigations do not suggest that persons outside Smiley's class were treated more favorably or that Columbia's reason for terminating Smiley's employment was pretextual. Downs interviewed more than one current student on only one occasion, when she interviewed three students during the investigation of Instructor 2. Although Smiley maintains Downs interviewed the complaining student and two non-complaining students in that investigation, Downs's statement in her memorandum that she "interviewed the students and faculty involved" makes it unclear

No. 10-3747 13

whether all the interviewed students had complained, or just one. (The nature of the class suggests that it likely would have had more than three students, so it is unlikely she interviewed all "involved" if "involved" means persons who heard the comments.) In any event all three students found the comments the instructor made in class offensive, whereas here the alleged comments were directed only toward one student (albeit made in front of the class). Notably, the interview of multiple students did not yield a more favorable result for Instructor 2, as he was found to have violated the Policy and not asked to teach any more classes. We also note that in all instances where Love was the decision-maker and a faculty member had been determined to violate the Policy, Love decided to no longer ask the instructor to teach classes.

Downs interviewed two former students (one via email) during her investigation of Instructor 4. Columbia reasonably asserts that interviewing former students is different than interviewing current students, for reasons including that there is the potential for current students to feel caught in the middle or pressured. And Downs did not interview other students after the student's allegations against Instructor 3. The student's allegations against Instructor 3 included assertions that could have been corroborated by other students or persons affiliated with the school, but Downs did not speak to anyone other than the student and instructor even though the instructor denied engaging in improper conduct. So other witnesses were not always interviewed during investigations. Indeed, the Policy

states that complaints will be treated in confidence to the extent feasible.

Notably too, it is clear that the interviews of multiple persons in the investigations of Instructors 2 and 4 were designed to corroborate the allegations against the instructor, not to gather a potentially favorable account for the instructor. And, again, the only other investigation where Downs spoke with other current students (the investigation of Instructor 2) also resulted in a finding that the instructor violated the Policy and would not be asked to return. The investigations to which Smiley points do not reflect favorable treatment to similarly situated non-Arab instructors.

Smiley also maintains that the district court abused its discretion when it declined to consider a declaration attached to her summary judgment response from a professor at Roosevelt University, where Love had served as the Associate Provost. The professor does not attest that Love made any derogatory statements about Arabs or Palestinians, but he says that a Roosevelt department chair had made disparaging comments about Palestinians. He then asserts that in a memorandum issued to the professor's union representative, Love made statements regarding the chairperson's comments including that the chairperson "had a right to express views as to the appropriateness of the time spent in class on the question [of the Arab-Israeli conflict]." But the declaration did not attach the memorandum, so the district court did not abuse its discretion when it declined to consider it on summary judgment after con-

cluding that Smiley did not show that the testimony would be admissible. *See* Fed. R. Civ. P. 56(c)(4) (declarations in support of motions for summary judgment must be made on personal knowledge and set forth facts that would be admissible in evidence); *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006) ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.").

Smiley also asserts that Calabrese told her, "I'm not here for you. I'm here for the students." Smiley argues that this statement is evidence Calabrese wanted to see Smiley's employment end. The statement indicates that the welfare of the students is the priority for Calabrese, but it does not go as far as Smiley contends. She also argues that differences between Love's testimony in her deposition and in her affidavit evidence pretext. At her deposition, Smiley's counsel asked Love what statements Smiley made in their meeting that corroborated Student A's allegations. Without the benefit of reviewing the summary she prepared immediately after her meeting with Smiley, Love cited examples including joking and teasing of students and her impression that Smiley did not understand the boundaries between students and faculty. Love's affidavit included more detail than her deposition response, but all the reasons she gave in her affidavit were stated in her deposition or summary memorandum.

Case: 1:09-cv-06183 Document #: 67 Filed: 05/22/13 Page 16 of 16 PageID #:984
Case: 10-3747   Document: 00712000012   Filed: 05/22/2013   Pages: 16

Pretext does not exist if the decision-maker honestly believed the nondiscriminatory reason for its employment action. *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010). That is because courts are not charged with determining best business practices. *Id.* On this record, we conclude that Smiley has not provided sufficient evidence of pretext and that summary judgment was proper.

### III. CONCLUSION

The judgment of the district court is AFFIRMED.

4-30-13